October 17, 1977

## 78-87    MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

### Privacy—Persons Writing to the President—Freedom of Information Act (5 U.S.C. § 552e (1976))

This responds to your request for our views as to the means available to protect the privacy of private persons who write to the President and whose letters are referred to the various Federal agencies for response.

It is our position that the President and his immediate staff are not agencies or part of agencies within the meaning of the Freedom of Information Act (the Act), 5 U.S.C. § 552(e) (1976) and thus private letters addressed to the President are not agency records subject to the Freedom of Information Act so long as they are maintained by the President or his staff. *See* Attorney General's 1974 Freedom of Information Amendments Memorandum at 25. However, when such letters are referred to other Federal agencies for reply they will, in the absence of some special arrangement, become agency records subject to the Act. As we understand it, your view is that persons who write to the President ought to be able to do so confidentially and that it would be an invasion of privacy to make their identity publicly available. There are several methods by which their privacy can be maintained.

1. *Demonstrable Bailment.* The ordinary presumption is that any record in the possession of an agency regardless of its origin is an agency record subject to the Act. However, the courts have recognized that the records originating in governmental units not covered by the Act may expressly be "loaned" to an agency that is subject to the Act without becoming an agency record. *Cook* v. *Willingham*, 400 F. (2d) 885 (10th Cir. 1968) (judicial presentencing report in the hands of the Bureau of Prisons); *Goland* v. *Central Intelligence Agency*, Civ. No. 76-166, D.D.C., May 26, 1976 (Congressional Record lent to the Central Intelligence Agency).[1] A somewhat similar bailment technique is also used by the Federal Bureau of Investigation and the Civil Service Commission to retain such control as they may have over the public release of certain investigatory records which they originate and subsequently disseminate

---

[1] Affirmed by the District of Columbia Court of Appeals, May 23, 1978.

to other Federal agencies; the records bear a printed legend that they are the property of the originating and not of the holding agency.

In our opinion, the President could probably use an express bailment, evidenced perhaps by a stamped legend on each letter, to reserve ownership and thus control over its release under the Act. (The reservation of ownership would be particularly credible if all or some are recalled by and returned to the White House after the agencies have prepared responses.) Nevertheless, such an express bailment technique would not be adequate in itself to protect the identity or privacy of private correspondents, because the replies generated by the agencies will ordinarily reveal the name and address of the correspondent and the general thrust of his inquiry, problem, or comment, and these replies—or rather their file copies—will be agency records subject to the Act. While it might be possible for the President to assert ownership of these file copies also, such an assertion would be questionable, and a strong argument could be made that they are agency records subject to the Act because they are generated and maintained by the originating agency in the ordinary course of agency business. Were the President to arrange that all agency copies of replies be physically delivered to him, he could, of course, remove them from the coverage of the Act. This alternative, however, seems equally questionable and also administratively unsound in that it would deprive agencies of copies of their own correspondence and, depending upon the nature of the agency response, might violate the Federal Records Act in some circumstances. Pub. L. 90-620, 44 U.S.C. §§ 3101-3314 (1976).

2. *Sanitizing Referrals to the Agencies.* When a private letter is referred to an agency, the President could send the agency a copy of the letter from which the name and address of the correspondent have been deleted and in which a control number has been substituted. The agency would then draft a proposed reply, using the code number of the incoming correspondence, and send the proposed reply to the White House where the identity of the correspondent would be decoded and the reply addressed, perhaps as reviewed and retyped on White House letterhead. In this manner, the identity of the correspondent would, in most cases, not be available in agency records and hence preserved from disclosure under the Freedom of Information Act.

We see at least two disadvantages with this method. First, the effort required to respond to private correspondence addressed to the President might be nearly doubled, in that each reply would have to be handled twice—once by the agency and then again in the White House. Second, in those cases where the letter contains personal identifying information about the writer which the agency will need in formulating a meaningful reply, such as a personal complaint about obtaining social security or other Federal benefits or permits, this proposed method simply would not work except at the price of precluding a meaningful reply. Yet such letters may well be the ones most deserving both of a responsive reply and of privacy protection because of the personal informa-tion they may contain. In any case, substituting a code number for the writer's name and address offers no privacy protection where the correspondent is writing about the problems of a relative or friend identified in the body of the letter.

· 3. *Reliance on the Privacy Exemption in the Freedom of Information Act.* In our view, the names and addresses of private correspondents and other personally identifying data in letters to the President, after referral to agencies for reply, would usually be withholdable under the sixth exemption of the Freedom of Information Act because disclosure would constitute a "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b) (6) (1976): *cf., Wine Hobby, U.S.A., Inc.* v. *United States Bureau of Alcohol, Tobacco, and Firearms,* 502 F.(2d) 133 (3d Cir. 1974). Almost all such letters either contain some personal information about the writer or a member of his family, if not information about personal opinions which the writer chooses to communicate to the President but presumably not the the entire public.[2] In the ordinary case, a requester would have no justifiable interest in determining the identity of the correspondents; any legitimate interest, such as attempting to determine the mix of citizen correspondence addressed to the President, would be served by making available copies of the letters which have been sanitized by deleting names and other identifying information.[3] While one can reasonably anticipate that a few requests will relate to matters which have a substantial public interest, and in which withholding of identifying information would be improper under the Act because the legitimate public interest in disclosure of identity outweighs the individual's privacy, it seems to us that disclosure of identification in such rare cases would not be undesirable.

To help assure uniform agency implementation of a decision to use the sixth exemption to protect the privacy of correspondents, the President could proceed either (a) by instructing all agencies to preserve from clearly unwarranted invasions the privacy of individuals involved in correspondence referred from the White House, by withholding the name and other identifying data if such correspondence is to be made available in response to requests under the Act,[4] or (b) by requiring that such records be maintained in a "system of records" as defined in the Privacy Act. 5 U.S.C. § 552a (1976). In the second way, the Privacy Act's sanctions for improper disclosure would buttress the protection for the privacy of correspondents. However, such added protection, while stronger than that afforded by a Presidential directive or agency policy unsupported by sanctions, would be no greater in scope: The measure of the material that could be protected would still be the sixth exemption and in rare instances identities might have to be released in the public interest. Moreover, the use of the Privacy Act is unnecessarily cumbersome because it would

---

[2]In many, and perhaps most, private letters to the President, there would seem to exist a public interest element which should reinforce, rather than counterbalance, the usually minor invasions of the writers' privacy. This is the public interest, which has First Amendment overtones, in protecting the right to petition the President without the chilling effect of fear of publicity. Of course, where the writer is communicating on behalf of an organization, privacy considerations would rarely be applicable, and the mix of public interest factors would be much more likely to call for disclosure.

[3]*Cf., Rose* v. *Air Force,* 425 U.S. 352 (1976).

[4]This memorandum assumes that the Freedom of Information Act requests for private letters addressed to the President will typically come from requesters who do not know the identities of the writers of such letters. Where a request is for letters from named writers, privacy interests would have to be protected by deleting privacy information rather than identifying such information.

require agencies which do not presently maintain their referred private correspondence in a Privacy Act system of records to establish a new system of records, thereby subjecting themselves to additional Privacy Act burdens. For example, use of the Privacy Act would often introduce complications if the agency to which the letter is referred finds it must contact another agency to develop a meaningful reply. The use of a Presidential instruction with respect to invoking the sixth exemption should suffice.

*Recommendation.* We believe that, for the reasons discussed above, the privacy of those who write to the President can best be preserved through use of some form of guidance to the agencies to which the correspondence is referred. In effect, the agencies would be told or encouraged, when processing Freedom of Information Act requests for such material to delete personal identifying information from the letters and responses thereto as contemplated by the sixth exemption of the Act. This method should be effective and impose a minimal administrative burden on the agencies concerned. We would be glad to participate in the drafting of such guidance if it is determined to proceed along these lines.

ROBERT L. SALOSCHIN. *Chairman*
and
THOMAS C. NEWKIRK. *Member*
*Department of Justice*
*Freedom of Information Committee*
*Office of Legal Counsel*
